**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SHANNON J. MANDEL, | CIVIL ACTION NO. 3:09-CV-0042 |
| Plaintiff, | |
| v. | (JUDGE CAPUTO) |
| M & Q PACKAGING CORP., | |
| Defendant. | |

**MEMORANDUM**

Plaintiff Shannon Mandel filed a complaint against her former employer, M & Q Packaging Corporation ("M & Q").  She brings claims under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act ("PHRA").  The defendant moves for summary judgment.  (Doc. 27.)  Mandel's claims under the PHRA are time barred, and because she cannot establish a continuing violation, many of her claims under Title VII are also time barred.  Further, Mandel failed to establish a hostile work environment or a prima facie claim of sex discrimination.  Based on this, M & Q's motion for summary judgment will be granted.

## I. Background

**A. Procedural Background**

Shannon Mandel began working for M & Q on October 28, 1996 and worked there until she submitted a resignation letter with two weeks' notice on May 23, 2007.  On September 17, 2007, the Equal Employment Opportunity Commission ("EEOC") received

1

a charge information questionnaire from Mandel, alleging that she was subjected to discrimination on the basis of her sex and expressing her desire to file a charge of discrimination.  On December 14, 2007, Mandel filed a charge of discrimination with the EEOC and cross-filed her complaint with the Pennsylvania Human Relations Commission.

On January 9, 2009, Mandel filed a complaint in district court against M & Q, bringing claims under Title VII of the Civil Rights Act of 1964, codified at 42 U.S.C. §§ 2000e *et seq.*, and the PHRA, codified at 43 Pa. Cons. Stat. §§ 951 *et seq.* She also brought a state law claim for intentional infliction of emotional distress.  M & Q moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).  To the extent that the complaint brought a claim for retaliation under Title VII or the PHRA, it was dismissed. Additionally, the state common law claim of intentional infliction of emotional distressed was dismissed.  The plaintiff is now proceeding with claims of gender discrimination under the PHRA, and hostile work environment and constructive discharge under Title VII.

M & Q moves for summary judgment.  The plaintiff opposes the motion.  The motion has been fully briefed and is ripe for disposition.

## B. Evidentiary Issues

Before detailing the factual background of the case, it is necessary to address some of M & Q's evidentiary concerns.

M & Q first objects to the consideration of testimony from two women–Sherri Buckmaster and Erin Hossler--who previously worked for M & Q Plastic Products, Inc. (as opposed to M & Q Packaging Corp., which was Mandel's employer and is the defendant in

this case).[1]   In that testimony, the women allege discriminatory actions on the part of employees of M & Q Packaging Corp.  Defendant argues that this testimony is irrelevant "me too" evidence and is inadmissible character evidence.

Evidence that other members of a protected class suffered similar discrimination is not *per se* admissible or *per se* inadmissible.  *Spring/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008).  Rather, it is the job of the district court to determine if the evidence is admissible.  *Id.*  "[E]vidence that women other than the plaintiff were subjected to a hostile work environment clearly meets Rule 401's [relevance] requirements in a number of situations."  *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 110 (3d Cir. 1999).  For instance, the evidence may be relevant to prove intent or to prove whether an employer knew or should have known about harassment.  *Id.* at 111 (citing *West v. Phila. Elec. Co.*, 45 F.3d 744, 752 (3d Cir. 1995)).  Evidence of previous bad acts are not admissible "to prove the character of a person in order to show conformity therewith," however.  Fed. R. Evid. § 404(3)(b).

In this case, Buckmaster and Hossler were not employed by the defendant, and neither states that they complained about harassment to the defendant.  Therefore, their testimony is not relevant to whether  M & Q knew or should have known of the occurrence of sexual harassment.  Further, Hossler's statements that she was ignored upon return from her maternity leave are irrelevant because she explains that she was ignored by employees of both genders and presents no evidence that this was related to sex discrimination.  Finally, Buckmaster's testimony about statements made to her by Plant Manager Ernie

---

[1] Buckmaster was deposed for this case; Hossler's testimony is from her deposition in a prior suit against Defendant.

Bachert are not relevant to prove Bachert's intent with Mandel because of the different nature of the relationships–Bachert and Buckmaster had a romantic relationship, whereas Bachert and Mandel only had a collegial relationship.  Because Buckmaster and Hossler's statements about their own experiences with harassment are not relevant to prove intent or knowledge of Mandel's allegations and are not admissible to prove that the M & Q employees acted in conformity with a character tendency to harass women, they will not be considered.  Buckmaster's statements about Mandel's harassment, however, are clearly relevant and will be considered.

Defendant's second objection is regarding three alleged incidents of harassment that Mandel included in her statement of facts.  Mandel discussed these incidents in her EEOC intake questionnaire, but did not actually testify to them in her deposition.  Because a party must present more than "bare assertions" or "conclusory allegations" to overcome summary judgment, *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005); *see also Jones v. UPS*, 214 F.3d 402, 407 (3d Cir. 2000), these incidents will not be considered.

## C. Factual Background

### 1. Employment at M & Q

Shannon Mandel was hired by M & Q on October 28, 1996.  From her date of hire until approximately 1998 or 1999, she reported to George Schmidt.  Subsequently she reported to Jack Menges, Vice President, until February 2006.  From February 2006 until May 23, 2007, Mandel reported to Michael Schmal, the Managing Director of M & Q.

Mandel's final position with M & Q was as the Inside Sales and Customer Service Coordinator.  Mandel characterizes this as a managerial position, but M & Q does not.

Mandel did not manage any employees, and her job description did not reflect that she was a manager.  Mandel attended meetings that she characterized as management meetings and Bachert characterized as staff meetings.  Several managers attended these meetings. Mandel testified that managers Bachert, Larry Dahm (Department Manager), Jack Conway (Personnel Manager) were her peers.

During Mandel's employment with M & Q, the company had an Employee Handbook. Mandel received the handbook and the handbook revisions.  The handbook included an Equal Employment Opportunity Policy ("EEO Policy").  The EEO Policy advises employees to report harassment or discrimination to the personnel manager in the personnel office. Bachert testified that the term "personnel manager" referred to M & Q's Human Resources and Purchasing Manager and that the term "personnel office" referred to M & Q's Human Resources Department.  The handbook also included an "Open Door Policy" directing employees to take problems to supervisors first, and then if the problem does not get resolved, to meet with the personnel manager.  During Mandel's employment, there was no training on sexual harassment, discrimination, or equal opportunity employment, other than a reference to the handbook.

Mandel occasionally used the term "fuck" in the workplace.  On three or four occasions, Mandel called Bachert "gay."  Mandel testified that this was part of an ongoing joke in which Mandel told Bachert to claim he was gay as a defense against jealous husbands who said Bachert made sexual advances on their wives.  Mandel also on multiple occasions sent out e-mails to coworkers that contained sexual humor.

### 3. Sex Discrimination and Sexual Harassment

Mandel asserts that she was a victim of sex discrimination and sexual harassment

5

throughout her tenure at M & Q. While the defendants dispute that the following incidents occurred (with exceptions where noted), the facts in evidence are viewed in the light most favorable to Mandel, as the non-movant. *See* Fed. R. Civ. P. 56.   Mandel alleges the following:

Bachert Incidents: Once in 2006, after Mandel told Bachert that she had hurt herself in the shower, he asked her if she had hurt herself having sex.  Additionally, during a meeting in 2006, Bachert told Mandel she was "being a bitch."  On several occasions, Buckmaster witnessed Mandel ask Bachert to leave her office because he was being inappropriate.  Buckmaster also on several occasions heard Bachert call Mandel a "bitch" to her face as well as refer to her as "bitch" when she was not around.  Bachert is still employed with M & Q.

Benetz Incident: On April 7, 2004, Mandel e-mailed David Benetz, who worked in the North Wales office IT Department, asking for the starting and ending times of a meeting. Benetz responded by e-mail, "For you...the meeting will start at my house and we will conclude our part of it tomorrow morning–maybe...we may need to postpone the meeting with everyone else a few hours to finish up..."

Brenneman Incidents: Approximately three times per week, whenever Mandel was wearing a skirt, Brenneman would make comments about how "tan and smooth" Mandel's legs were.  Brenneman's employment overlapped with Mandel's from October 28, 1996 until December 1, 1998.  Buckmaster also testified that Brenneman made sexual innuendo comments about the women who worked as his assistants.  Brenneman left M & Q in December of 1997.

Career Advancement Issues: Mandel was not offered career advancement or a

6

commission package.  In 2006, Dahm left and M & Q hired an outside candidate to take his position instead of combining Dahm's department with Mandel's department. M & Q had recently implemented a new computer system, and Menges told Mandel that he wanted to hire someone with a computer background.  Mandel did not receive commission.  Some males that worked for M & Q Plastic Products, Inc. earned commissions.

Conway Incidents: When Mandel told Conway she needed time off for gynecological surgery in June or July of 2006, he told her it was a "shame she would stoop to that level to take time off."  On ten to fifteen occasions when Mandel wore high heel shoes between 2005 and 2006, Conway referred to the heels as "beat me, bite me" shoes.  (Conway admits that he referred to the shoes this way on one occasion by telling Mandel that his female friend refers to high heel shoes as her "beat me, bite me" shoes.)  Conway called Mandel by the following names: "darling" (up to ten times per month), "toots" (ten to fifteen times per month), "female" (thirty to fifty times per year), "woman" (fifteen times per month), and "missy" (ten to fifteen times per month).  Mandel also heard from coworker Loreen Cunkle that Conway referred to Mandel as "fluffy" when she was not there. (Conway admits that he called her "fluffy" as an ironic reference to her moodiness in the workplace and that he would have stopped using the term if she had complained about it.)  Additionally, when Mandel was first employed at M & Q in 1996, she was required to make coffee for Dahm and Conway. Mandel did not deliver the coffee to Dahm and Conway; she made it and left it in a pot in the kitchen.   Dahm and Conway were the only two employees Mandel noticed drinking the coffee.  Conway worked at M & Q the entire time Mandel was there.

Dahm Incidents: Between 2002 and 2003, Mandel was told between three and five times by Larry Dahm, the Department Manager, that she was "foolish not to use [her] assets"

and that she was "sitting on a gold mine, really, sitting on a gold mine."  Dahm also called her "hon," "darling," or "toots" up to five times per week until he left M & Q in 2006.  Mandel also heard from coworker Loreen Cunkle that Dahm referred to Mandel as "fluffy" when she was not there.  (Additionally, as detailed above along with the Conway Incidents, Mandel was required to make coffee for Dahm and Conway.)

Rubenstein Incidents: On three occasions, Curt Rubenstein, Vice President of Sales, solicited Mandel for dates.  Rubenstein asked Mandel if she would go to the gym and work out with him, go out to dinner, and go back to where she was staying.  Rubenstein began working for M & Q in 2006.

Salary Issues: Mandel states that she was at one point earning less and receiving less vacation time than Frank Drozal, the Accounting Finance Manager.  According to Mandel, Drozal's position is at the same level of corporate hierarchy as is hers.  Drozal has an accounting degree; Mandel does not.

Schmal Incidents: In an October 31, 1996 performance review, Schmal wrote, "Shannon always handles difficult situations, but I worry sometimes if she might break down." When Mandel asked Schmal to explain that statement, Schmal told Mandel that she was "too female" and "too emotional."  Mandel also was reprimanded by Schmal for not attending the 2006 holiday luncheon.  Mandel did not attend because her back was hurt and she needed to get work done in her office.  She did not tell anyone in advance that she was not going to attend.  After the lunch, Schmal called Mandel into his office and told her that her failure to attend was disrespectful and she needed to be a team player.  Schmal told her to shut her mouth when she tried to explain why she did not come.  Schmal did not place a reprimand in her file regarding the luncheon absence.  Mandel is unaware of whether any

male employees missed the 2006 luncheon. In past years, Mandel claims, some male employees have missed the luncheon and were not called into the office. Those employees did not work under Schmal.  Additionally, in December of 2006, Schmal told Mandel to make sure the bathroom was "presentable" before a corporate executive luncheon.  Mandel took this to mean she should clean the bathroom, and she did clean it, including the toilets. Mandel claims that no men were asked to clean the bathroom.

Mandel did not complain about any of these issues or incidents with two exceptions. First, she complained to George Schmidt on one occasion in 1996 about having to make coffee.  She testifies that in response, Schmidt laughed and told her, "That's the way [Conway and Dahm] are."  Second, Mandel mentioned to Buckmaster that Bachert had made inappropriate comments to Mandel.  Buckmaster testified that she responded by suggesting that Mandel speak to Conway, but did not recall if Mandel took the advice.  In Mandel's EEOC charge, she stated, "If I would have said anything about the comments it would have been impossible to work there or I believe I would have been immediately terminated."

Neither Menges nor Schmidt ever harassed Mandel.

### 4. Termination of Employment at M & Q

Mandel alleges (and M & Q denies) that during a meeting on April 6, 2007, Bachert referred to Mandel as a "bitch" and told her to "shut the fuck up."  According to Mandel, this incident led to her belief that she had been constructively discharged.  On May 23, 2007, Mandel wrote a letter to Schmal giving him two weeks' notice that she was terminating her employment with M & Q.  She did not mention any harassment or discrimination issues in the letter.  Mandel later testified that this was because she feared retaliation.

## II. Discussion

### A. Legal Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

### B. PHRA Claims

At Count III of the complaint, Mandel brings a claim under the Pennsylvania Human Relations Act, 43 Pa. Cons. Stat. §§ 951 *et seq.* The PHRA prohibits, among other things, discrimination on the basis of sex in employment. *Id.* at § 953. Under the PHRA, "[a]ny complaint filed pursuant to this section must be so filed within one hundred eighty days after the alleged act of discrimination, unless otherwise required by the Fair Housing Act." 43 Pa. Cons. Stat. § 959(h).

M & Q argues that Mandel's PHRA claims are time barred.  Mandel failed to cross-file her complaint with the Pennsylvania Human Relations Commission (PHRC) until December 14, 2007.  Because Mandel was not employed by the defendant at any time during the 180 days prior to December 14, 2007, this would mean that the statute of limitations on any PHRA claims has expired.

Mandel disputes this, arguing that the 180 days should be calculated from September 13, 2007, the EEOC received her charge information questionnaire indicating that she wanted to file a charge of discrimination.  However, the filing of a charge with the EEOC *in itself* is not sufficient to comply with the PHRA. *See* Woodson v. Scott Paper Co., 109 F.3d 913, 926–27 (3d Cir. 1997) ("That, however, does not mean that a plaintiff can initiate PHRC proceedings as required by the *PHRA* merely by filing with the EEOC. Whether a plaintiff has initiated PHRC proceedings under the PHRA is a state law issue.")  Logically, then, the mere filling out of an EEOC charge information questionnaire cannot be in itself sufficient to comply with the PHRA.  Nothing on the charge information questionnaire form indicated that it constituted a dual filing with the EEOC and the PHRC. Thus, Mandel did not file with the PHRC until she signed a form on December 14, 2007 indicating that she wanted to dual file.

Mandel also argues that because Pennsylvania has a state law prohibiting discrimination (making it a "deferral" state), her available filing time is extended from 180 days to 300 days.  This is correct, but only in terms of extending the statute of limitations for the EEOC charge to 300 days.  42 U.S.C.A. § 2000e-5(e)(1).  There is no provision of the PHRA that extends the limitations period to 300 days under any circumstances.

Mandel fails to submit evidence controverting the defendant's evidence showing that she dual-filed her charge with the PHRC on December 14, 2007.  It is undisputed that all of Mandel's claims arose prior to the 180 day period ending on  December 14, 2007.   Thus, Mandel's claims under the PHRC are time barred, and defendants are entitled to summary judgment in their favor on these claims.

## C. Title VII Claims

Mandel also brings claims under Title VII of the Civil Rights Act of 1964, which makes it an "unlawful employment practice" for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C.  § 2000e-2(a)(1).  Title VII does not prohibit merely "economic" or "tangible" discrimination, but also protects workers from a "work environment abusive to employees because of their . . . gender." *Harris v. Forklift Systems, Inc.*, 510 U.S. 15, 21-22 (1993).  Count I of Mandel's claim alleges sex discrimination and Count II alleges sexual harassment.  M & Q moves for summary judgment on both counts.  First, M & Q argues that many of the acts alleged in the claims are time barred.  M & Q also argues that Mandel cannot establish either a hostile work environment or a prima facie discrimination case.

### 1. Statute of Limitations

 Under Title VII, a claimant in a deferral state, such as Pennsylvania, must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice before pursuing remedies in federal court. 42 U.S.C. § 2000e–5(e)(1); *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000).  "This statute of limitations applies to discrete employment actions, including promotion decisions." *Id.* (citing *Nat'l*

*R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).  Mandel's Career Advancement allegation regarding a failure to promote in 2006 is a discrete employment action.  Therefore, the statute of limitation bars any claims based on this allegation and the allegation will not be considered.

While "discrete discriminatory acts are not actionable if time barred," hostile environment claims may survive under the continuing violation theory.  *Morgan*, 536 U.S. at 113.   Hostile environment claims are distinguished because "[t]heir very nature involves repeated conduct," meaning the unlawful employment practice "cannot be said to occur on any particular day." *Id.* (internal citations omitted).  Instead, "a hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (citing § 2000e–5(e)(1)).  Thus, under the continuing violation theory, a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122.

Because Mandel did not file her EEOC charge until December 14, 2007, any alleged unlawful acts contributing to a hostile work environment claim and occurring prior to February 18, 2007 will be time barred unless Mandel can establish a continuing violation.  Several of the alleged incidents fall within the limitations period, so Mandel's hurdle is to demonstrate a "persistent, on-going pattern" of discrimination comprised of the acts outside of the limitations period and at least one of the acts within the period. *West v. Phila. Elec. Co.*, 45 F.3d 744, 754-55 (3d Cir. 1995).

To determine whether a group of incidents represents a persistent, ongoing pattern or are instead isolated, sporadic acts of discrimination, the Third Circuit has

adopted the Fifth Circuit's three factor test considering:

> "(i) subject matter - whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence - whether the nature of the violations should trigger the employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate."

*Id.* at 755 n.9 (quoting *Martin v. Nannie & Newborns, Inc.*, 3 F.3d 1410 (10th Cir. 1993));

*accord Berry v. Bd. of. Supervisors of La. State Univ.*, 715 F.2d 971, 981 (5th Cir. 1983).

In terms of subject matter, Mandel's claim succeeds: all of her allegations involve sex

discrimination.  Mandel also has shown frequency by asserting many acts spanning

between 1996 and 2007, including many recurring acts (such as employees referring to

her as "toots" or "woman").   M & Q argues that between 1999 to February 2006, the only

alleged acts of harassment were Conway's calling Mandel "woman," but in fact during

that period Mandel also alleged Dahm's comments, the Benetz Incident, and the Conway

"beat me bite me" comments.  Regardless, in the context of sexual harassment, the

existence of time gaps does not foreclose a finding of frequency.  *See Waltman v. Int'l

Paper Co.*, 875 F.2d 468, 475-76 (5th Cir. 1989); *accord Stair v. Lehigh Valley

Carpenters Local Union No. 600*, 813 F. Supp. 1112, 1116 (E.D. Pa. 1993).

The degree of permanence is the most important factor in the continuing violation

analysis, *see Cowell v. Palmer Twp*, 263 F.3d 286, 292 (3d Cir. 2001), and it is here that

Mandel fails.  When considering the degree of permanence, courts must keep in mind

the policy rationale behind the statute of limitations and ensure that the continuing

violation doctrine does not "provide a means for relieving plaintiffs from their duty to

exercise reasonable diligence in pursuing their claims."  *Id.* at 295 (citing *Nat'l Adver. Co.

v. City of Raleigh*, 947 F.2d 1158, 1168 (4th Cir. 1991); *Ocean Acres Ltd. v. Dare Cnty.*

14

*Bd. of Health*, 707 F.2d 103, 106 (4th Cir. 1983)).  In Mandel's case, although no one

incident may have had a significant degree of permanence, ten years of experiencing

persistent harassment is sufficiently permanent that it should have triggered Mandel's

awareness of the need to assert her rights.  *See Cowell*, 263 F.3d at 295 (rejecting the

application of the continuing violation theory where plaintiffs knew of wrongfulness of

liens for seven years before filing a due process claim); *Phillips v. Heydt*, 197 F. Supp. 2d

207, 218 (E.D. Pa. 2002) (rejecting the application of the continuing violation theory

where plaintiff was aware of the incidents of racial discrimination that occurred over a

fourteen-year period and was thus "on notice that he worked in a hostile environment").

*But see Waltman v. Int'l Paper Co.*, 875 F.2d 468, 475-76 (5th Cir. 1989) ("Acts of

harassment that create an offensive or hostile environment generally do not have the

same degree of permanence as, for example, the loss of promotion.").

     This is not a case where the plaintiff is attempting to use the continuing violation

theory to reach back and include one or two incidents that occurred outside limitations

period on the grounds that she did not realize the incidents constituted harassment until

she later could view them in the context of harassment within the limitations period.

Rather, here the majority of the alleged unlawful incidents occurred outside the limitations

period, and Mandel's two complaints (including one in 1996 about having to make coffee)

demonstrate that she recognized that she needed to assert her rights.  Mandel did not

pursue her claim with reasonable diligence, and thus she is precluded from using the

continuing violation theory.  To the extent that she alleges claims involving acts that

occurred prior to February 14, 2007 (three hundred days prior to her filing the EEOC

charge), those claims are time barred.

Mandel again argues that the timely filing period should be calculated back from September 13, 2007, when the EEOC received her charge information questionnaire. M & Q cites *Bailey v. United Airlines* for the proposition that an intake questionnaire does not constitute a charge for the purpose of tolling the statute of limitations period.  279 F.3d 194, 199 n.2 (3d Cir. 2002).  But since *Bailey*, the Supreme Court has examined the issue, determining that a questionnaire may serve as a charge where it meets the EEOC's regulatory definition of a "charge" and can be "reasonably construed as a request for the agency to take remedial action to protect the employee's rights or otherwise settle a dispute between the employer and the employee."  *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 393 (2008).

Both *Bailey* and *Holowecki* addressed EEOC charges and questionnaires under the Age Discrimination Education Act, and the *Holowecki* Court stressed that other courts should reconsider the issue before applying its holding to other statutes.  *Id.* at 393 (noting that the EEOC enforcement mechanisms and statutory waiting periods for ADEA claims are somewhat different from those under Title VII).  Although the Third Circuit has not directly addressed the question, *cf. Joseph v. Pa. Dept. of Envtl. Protection*, 309 Fed. Appx. 636, 637 (3d Cir. 2009) (remanding to district court for consideration of whether *Holowecki* applies to Title VII), the majority of district courts within the circuit have either endorsed the *Holowecki* test, *see, e.g.*, *Hayes v. Del. State Univ.*, 726 F. Supp. 2d 441, 451 (D. Del. 2010); *Wood v. Kaplan Properties, Inc.*, No. 09-1941 (JLL), 2009 WL 3230267, at *4 (D.N.J. Sept. 29, 2009); *Joseph v. Pa.*, No. CIV. A. 06-4916, 2009 WL 1012464, at *1 (E.D. Pa. Apr. 15, 2009), or have determined that regardless of *Holowecki*, the questionnaire at issue constituted a charge, *see, e.g.*, *Waites v. Kirkbride*

*Ctr.*, No. 10-CV-1487, 2011 WL 2036689, at *5 (E.D. Pa. May 23, 2011); *Kellam v.*

*Independence Charter Sch.*, 735 F. Supp. 2d 248, 252 (E.D. Pa. 2010).

Based on the majority of precedent, Mandel's EEOC intake questionnaire can be considered a charge sufficient to toll the statute of limitations.  It satisfies the EEOC's regulatory definition that states, "[A] charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of."  29 C.F.R. § 1601.12(b).  Mandel's charge lists the Defendant's name and address as well as detailed allegations of sex discrimination and harassment.  Further, Mandel's questionnaire can be reasonably construed as a request to take action, as required by *Holowecki*.  Mandel checked a box on the questionnaire indicating "I want to file a charge" and did not check the box stating "I want to speak with an EEOC Representative before this is filed as a charge."  This clearly demonstrates Mandel's intent for the EEOC to take action.  As the Court noted in *Holowecki*, Title VII creates a "remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process."  *Holowecki*, 552 U.S. at 402 (citations omitted).  Allowing an intake questionnaire to constitute a charge ensures that the system remains  "accessible to individuals who have no detailed knowledge of the relevant statutory mechanisms and agency processes." *Id.* at 403.

Because Mandel's September 13, 2007 EEOC intake questionnaire tolled the statute of limitations on her Title VII claims, her claims will not be time barred if they occurred prior to November 17, 2006.  Thus, Mandel's claims regarding the ongoing names Conway called her, the ongoing commission issue, the ongoing salary issue, the Schmal bathroom incident, and the April 2007 Bachert meeting.  Mandel's claims

regarding the Benetz Incident, Brenneman Incidents, Conway gynecological comment and "beat me bite me" comments, the coffee incident, the Dahm Incidents, and the Schmal performance review are all time barred.  M & Q's motion for summary judgment will be granted as to these claims.

Unfortunately, many of Mandel's alleged claims lack a specific date, making it more difficult to determine whether they are time barred.  Construing the evidence in the light most favorable to the plaintiff, for the purposes of this motion, the Rubenstein Incidents, Bachert shower comment, Bachert bitch comment, Mandel asking Bachert to leave her office, and the Schmal holiday party incident will all be considered.  If, however, Defendant can demonstrate that these alleged incidents occurred or must have occurred prior to November 17, 2006, they will be time barred.

### 2. Sexual Harassment

Sexual harassment is prohibited under Title VII where a plaintiff demonstrates that it was "sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment."  *Meritor Sav. Bank, FSB v. Vinson*, 447 U.S. 57, 67 (1986) (internal quotations marks omitted).  In the Third Circuit, a plaintiff must establish five elements to succeed on a hostile work environment claims: (1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability.  *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006) (overruled on other grounds by *Burlington N. &*

*Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).  The first four elements are required to establish a hostile work environment; the fifth element determines employer liability. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). Because Mandel provided insufficient evidence to satisfy the third element, she fails at establishing a hostile work environment.

### a. Intentional Discrimination Based on Sex

To establish intentional discrimination because of sex, a plaintiff need not show "direct evidence" of the harasser's motivation or intent.  *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001).  Rather, "intent to discriminate can be inferred" from the record.  *Id.* (citations omitted).  Here, Mandel has presented evidence that she was called names such as "bitch," "female," "missy," and "woman."  She was also asked questions about her sex life and asked out on dates.  Viewing this evidence in the light most favorable to Mandel, this is sufficient evidence from which a reasonable jury could infer that the alleged harassment was based on her sex.

### b. Severe or Pervasive Discrimination

In considering whether a workplace is hostile, courts must consider the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993).  Generally, mere teasing, offhand comments, and isolated mild incidents are not sufficiently severe or pervasive to establish a hostile work environment claim; Title VII is not a "general civility code."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (U.S. 1998) (citing *Oncale v. Sundowner Offshore Servs., Inc.*,

523 U.S. 75. 80-82 (1998).

The evidence, viewed in the light most favorable to Mandel, reveals that her harassment was limited to the following: (1) at least thirty-five times per month, Conway referred to her as "darling," "toots," "woman," "female," and "missy" (as well as being called "fluffy" behind her back); (2) three instances of Rubinstein asking her out on a date; (3) one instance of Bachert asking her if she had injured herself having sex; (3) two instances of Bachert calling her "bitch"; (4) one instance of Schmal asking her to make sure the bathroom was "presentable" when he did not ask male employees to do so and (5) one instance of Schmal yelling at her for missing an office party when male employees did not get in trouble for missing parties.  M & Q argues that none of these incidents is particularly severe, and cites cases in which courts have granted summary judgment to defendants despite incidents more severe than in this case.  *See, e.g.*, *Grassmyer v. Shred-It, USA, Inc.*, 392 Fed. App'x 19, 30 (3d Cir. 2010) (affirming summary judgment for defendant where plaintiff's supervisor regularly made comments about his genitalia and sexual relationships, referred to women as "bitches," discussed visiting "titty bars," and frequently used the word "fuck"); *McGraw v. Wyeth-Ayerst Labs., Inc.*, No. 96-5780, 1997 WL 799437, at *6 (E.D. Pa. Dec. 30, 1997) (granting judgment as a matter of law to defendant where plaintiff's supervisor "constant[ly]" asked her out, forced his tongue in her mouth on one occasion, and made her feel physically threatened by yelling at her).  Although Mandel was treated in a way that was clearly not professional, M & Q is correct that none of the alleged incidents is sufficiently severe to establish a hostile work environment.  Conway's name calling, however, occurred at least on a daily basis, making it sufficiently regular that a reasonable fact finder could find that

20

it was pervasive conduct, especially when combined with the other incidents.  Therefore, a genuine issue of material fact exists as to this element of the hostile work environment test.

### c. Effect of Harassment on Plaintiff

Psychological harm and unreasonable interference with work performance are both relevant, but not necessary, factors in the inquiry into the harassment's effect on the plaintiff.  *Harris*, 510 U.S. at 22-23.  Here, Mandel only complained about one of the alleged incidents (Bachert's name calling), and she complained to a friend at work and not a supervisor.  Further, she has presented no evidence that she had any psychological distress or that her ability to perform her job was impaired.  Finally, the record contains evidence that Mandel actively participated in creating a work environment in which vulgarity and sexual innuendo were commonplace.  Mandel's use of explicit language and her e-mails involving ongoing sexual jokes demonstrate a casual ease with this type of workplace behavior.  The use of sexual humor does not on its own demonstrate that Mandel is incapable of being offended by degrading comments, but when combined with a lack of evidence of any subjective distress, a reasonable jury could not find that Mandel has proven that the harassment had a detrimental effect on her.  Therefore, Mandel fails to provide sufficient evidence to satisfy this element.

### d. Effect of Harassment on Objectively Reasonable Person

To succeed on the fourth element, a plaintiff must show that the harassment would be offensive to an objectively reasonable person in order to "ensure that courts and juries do not mistake ordinary socializing in the workplace–such as male-on-male horseplay or intersexual flirtation–for discriminatory 'conditions of employment.'" *Oncale*, 523 U.S. at

21

81.  Here, an objectively reasonable person in Mandel's place might be offended by being called a bitch, asked whether she had injured herself having sex, and being referred to by arguably condescending or degrading terms such as "toots."  Thus, Mandel has presented sufficient evidence such that a reasonable jury could determine that the alleged harassment was objectively offensive.

### d. Conclusion

Even looking at the facts in the light most favorable to Mandel, she cannot demonstrate that she was subjectively offended by the alleged harassment at M & Q. Mandel has thus failed to provide evidence sufficient to prove a hostile work environment, and there is no need to examine the fifth element of employer liability.  M & Q's motion for summary judgment on Mandel's sexual harassment claim will be granted.

### 3. Sex Discrimination

Mandel asserts three claims of sex discrimination.  First, she claims that she was constructively discharged.  Second, she claims that she faced disparate treatment in the form of a wage disparity and a lack of career advancement opportunities or commission package.

In order to prevail in a sex discrimination claim under Title VII, a plaintiff must first establish a prima facie case of discrimination.  *Tex. Dept. of Comm'y Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  A prima facie case of discrimination requires a plaintiff to show: "(1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination."  *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1066 n.5 (3d Cir. 1996) (en banc)).  The Third Circuit has noted that "there is a low bar for establishing a *prima facie* case of employment discrimination." *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).  Here, M & Q does not dispute that Mandel is a member of a protected class based on her sex and she was qualified for her position.  Instead, it challenges her claims on the third and fourth elements.

### i. Constructive Discharge

M & Q argues that Mandel cannot prove an adverse employment action because she was not constructively discharged.  Constructive discharge occurs where an employer "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign." *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887 (3d Cir. 1984).  Where a plaintiff cannot make out a hostile work environment claim, she necessarily fails at establishing a constructive discharge claim, because she cannot prove intolerable conditions of discrimination. *See Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006) ("'To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.'") (quoting *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, 511 U.S. 244); *Konstantopoulos v. Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (affirming district court's rejection of a constructive discharge claim where the plaintiff could not show a hostile work environment).  Because Mandel failed to establish a hostile work environment, she cannot demonstrate discrimination sufficiently intolerable that a

23

reasonable employee would resign.  Therefore, summary judgment will be granted to M & Q on Mandel's constructive discharge claim.

### ii. Wage Disparity/Disparate Opportunities

M & Q argues that Mandel cannot establish the fourth element of her prima facie claim on the wage disparity/disparate opportunities issue: she cannot raise an inference of discrimination.  A plaintiff can raise an inference of discrimination by showing that "the employer has previously discriminated against [the plaintiff], that the employer has previously discriminated against other persons within the plaintiff's protected class, or that the employer has treated more favorably similarly situated persons not within the protected class." *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999) (citing *Simpson v. Kay Jewelers*, 142 F.3d 639, 645 (3d Cir. 1998)) (alterations in original). Regarding the alleged wage disparity, Mandel has chosen the third route, by arguing that accountant Frank Drozal's higher salary creates an inference of discrimination on the part of M & Q.  Similarly, Mandel argues that similarly situated male employees received commissions.

Mandel fails to raise the necessary inference in either the wage disparity or commission claims because she compares herself to individuals who are not similarly situated to her.  First, the evidence shows that Drozal had a different position than Mandel and also a higher level of education, so he was not similarly situated.  Second, the evidence shows that the male employees who received commissions were not employees of Defendant, so they were not similarly situated.  Because neither of Mandel's comparators are similarly situated, she fails at raising an inference of discrimination and thus cannot establish a prima facie case of sex discrimination on

those claims.   In terms of the career advancement claim, Mandel did not provide *any* evidence to suggest an inference of discrimination, so she cannot prove a prima facie case for sex discrimination on that claim either.

Mandel has failed to provide sufficient evidence for a jury to find that she faced sex discrimination in the form of disparate treatment regarding wages and career opportunities.  Therefore, summary judgment will be granted to M & Q on these claims.

### III. Conclusion

For the reasons explained above, M & Q's motion for summary judgment (Doc. 27) will be granted.  An appropriate order follows.


  7/25/2011                                              /s/ A.Richard Caputo
Date                                                     A. Richard Caputo
                                                         United States District Judge

25

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SHANNON J. MANDEL,

      Plaintiff,

          v.

M & Q PACKAGING CORP.,

      Defendant.

NO. 3:09-CV-0042

(JUDGE CAPUTO)

**ORDER**

**NOW**, this __25th_ day of July, 2011, **IT IS HEREBY ORDERED** that:

(1) The defendant's motion for summary judgment (Doc. 27) is **GRANTED**.

(2) Judgment shall be entered in favor of the defendant and against the plaintiff.

(3) The clerk of court is directed to mark this case **CLOSED**.

          /s/ A. Richard Caputo
          A. Richard Caputo
          United States District Judge