**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SHANNON J. MANDEL,

    Plaintiff,

        v.

M & Q PACKAGING CORP.,

    Defendant.

CIVIL ACTION NO. 3:09-CV-0042

(JUDGE CAPUTO)

## MEMORANDUM

On January 9, 2009, Plaintiff Shannon Mandel filed a Complaint against her former employer, Defendant M & Q Packaging Corporation ("M & Q"), bringing claims under Title VII of the Civil Rights Act of 1964 and the Pennsylvania Human Relations Act ("PHRA"). On July 25, 2011, the Court granted summary judgment in favor of M & Q on Mandel's PHRA claims and Title VII hostile work environment, constructive discharge, and sex discrimination claims. On January 14, 2013, the United States Court of Appeals for the Third Circuit affirmed the Court's judgment on Mandel's PHRA claims and Title VII sex discrimination claims, reversed the Court's judgment on Mandel's Title VII hostile work environment and constructive discharge claims, and remanded the case for further proceedings. The parties have submitted briefs and given oral argument on the matters for remand. For the reasons below, the Court will deny M & Q's motion for summary judgment on Mandel's hostile work environment and constructive discharge claims.

## BACKGROUND

### A. Procedural Background

Shannon Mandel worked for M & Q from October 28, 1996 until she submitted a

resignation letter with two weeks' notice on May 23, 2007. On September 17, 2007, the Equal Employment Opportunity Commission ("EEOC") received a charge information questionnaire from Mandel, which alleged that she was subjected to discrimination on the basis of her sex and expressed her desire to file a charge of discrimination. On December 14, 2007, Mandel filed a charge of discrimination with the EEOC ("EEOC Charge") and cross-filed her complaint with the Pennsylvania Human Relations Commission ("PHRC").

On January 9, 2009, Mandel filed a Complaint in this Court against M & Q, bringing claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and the PHRA, 43 PA. CONS. STAT. §§ 951 *et seq.* She also brought a state law tort claim for intentional infliction of emotional distress ("IIED"). M & Q moved to dismiss the Complaint on March 16, 2009. On August 18, 2009, the Court dismissed Mandel's IIED claim for failure to state a claim and her Title VII and PHRA retaliation claims for failure to exhaust her administrative remedies. *See Mandel v. M & Q Packaging Corp.*, No. 3:09-CV-42, 2009 WL 2579308 (M.D. Pa. Aug. 18, 2009).

On November 8, 2010, M & Q moved for summary judgment on Mandel's remaining claims. The Court granted the motion on July 25, 2011. *See Mandel v. M & Q Packaging Corp.*, No. 3:09-CV-42, 2011 WL 3031264 (M.D. Pa. July 25, 2011). Specifically, the Court found all of Mandel's PHRA claims and all of her Title VII claims for incidents that occurred prior to November 17, 2006 to be time-barred. *Id.* at *6–8. The Court then considered the remaining incidents on the merits and granted summary judgment on Mandel's Title VII hostile work environment, constructive discharge, and sex discrimination claims. *Id.* at *11–13. Mandel appealed the Court's final judgment on August 10, 2011.

2

By Order and Opinion dated January 14, 2013, the United States Court of Appeals for the Third Circuit affirmed the Court's dismissal of Mandel's Title VII and PHRA retaliation claims as well as its grant of summary judgment on her Title VII sex discrimination claims and remaining PHRA claims. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 161 (3d Cir. 2013). However, it reversed the Court's grant of summary judgment on Mandel's Title VII hostile work environment and constructive discharge claims. *Id.* Notably, the Third Circuit declared that permanency is not required to establish a continuing violation and found that Mandel's hostile work environment claim may proceed under a continuing violation theory. *Id.* at 166–67. The Third Circuit remanded the case for this Court to determine the scope of incidents that are part of the continuing violation. *Id.* at 167. In doing so, the Court must decide whether three instances of harassment cited in Mandel's EEOC Charge, but not in her deposition testimony, are part of the continuing violation. *Id.* at 168. On remand, the Court must also "review the constructive discharge claim in light of evidence of a hostile work environment to determine if the conditions of Mandel's employment had become intolerable" and consider whether M & Q's laches defense applies. *Id.* at 167, 170.

On February 20, 2013, the Court issued an Order requiring both parties to submit briefs by April 3, 2013 on the following issues: (1) the continuing violation doctrine; (2) the parties' contentions for the incidents properly considered part of the continuing violation; (3) whether the incidents contained solely in Mandel's EEOC Charge are part of the continuing violation; (4) the parties' contentions regarding the totality of the circumstances analysis for determining the severity of the acts that form the continuing violation; and (5) the availability of the laches defense to M & Q. The parties timely filed briefs and reply briefs, and oral

3

argument was held on April 23, 2013.

**B. Factual Background**

### 1. Employment at M & Q

M & Q is a producer and distributor of diversified polyamide nylon film product lines. Shannon Mandel was hired by M & Q on October 28, 1996. From that date until approximately 1998 or 1999, she reported to George Schmidt, Sales Manager. Subsequently, she reported to Jack Menges, Vice President, until February 2006.[1] From February 2006 until May 23, 2007, Mandel reported to Michael Schmal, Managing Director.

Mandel's final position with M & Q was Inside Sales and Customer Service Coordinator. She characterizes this as a managerial position, but M & Q does not. Mandel did not manage any employees, and her job description did not reflect that she was a manager. Mandel attended meetings that she characterized as management meetings but Ernie Bachert, Plant Manager, characterized as staff meetings. Several managers attended these meetings. She testified that Bachert, Department Manager Larry Dahm, and Human Resources Manager Jack Conway were her peers.

During Mandel's employment with M & Q, the company had an employee handbook. Mandel received the handbook and revisions to it. The handbook included an Equal Employment Opportunity Policy ("EEO Policy"), which advises employees to report harassment or discrimination to the personnel manager in the personnel office. Mandel testified that she reviewed the EEO Policy at the time of her employment and understood it. She also testified that she understood Human Resources Manager Jack Conway to be

---

[1]     Neither Schmidt nor Menges are alleged to have harassed Mandel.

the "personnel manager." Bachert testified that "personnel manager" referred to Conway and that "personnel office" referred to M & Q's Human Resources Department. The handbook also included an "Open Door Policy" directing employees to take problems to supervisors first, and then to the personnel manager if the problem does not get resolved. During Mandel's employment, there was no training on sexual harassment, discrimination, or equal opportunity employment, other than a reference to the handbook.

Mandel occasionally used the term "fuck" in the workplace. On three or four occasions, Mandel called Bachert "gay." Mandel testified that this was part of an ongoing joke in which she told Bachert to claim that he was gay as a defense against jealous husbands who accused him of making sexual advances on their wives. On multiple occasions, Mandel sent out e-mails to coworkers that contained sexual humor.

### 3. Sex Discrimination and Sexual Harassment

Mandel asserts that she was a victim of sex discrimination and sexual harassment throughout her tenure at M & Q. While M & Q disputes that the following incidents occurred (with exceptions where noted), the facts in evidence are viewed in the light most favorable to Mandel at this stage. *See* Fed. R. Civ. P. 56. Mandel alleges the following:

<u>Bachert Incidents</u>: Once in 2006, after Mandel told Bachert that she had hurt herself in the shower, he asked her if she had hurt herself having sex. Additionally, during a meeting in 2006, Bachert told Mandel she was "being a bitch." On several occasions, Sherri Buckmaster, who is no longer employed at M & Q, witnessed Mandel ask Bachert to leave her office because he was being inappropriate. Buckmaster also on several occasions heard Bachert call Mandel a "bitch" to her face and refer to her as "bitch" when she was not around. Bachert is still employed with M & Q.

5

Benetz Incident: On April 7, 2004, Mandel e-mailed David Benetz, who worked in the IT Department of M & Q's North Wales office, asking for the details of an upcoming meeting. Benetz responded by e-mail, "For you...the meeting will start at my house and we will conclude our part of it tomorrow morning–maybe...we may need to postpone the meeting with everyone else a few hours to finish up..."

Brenneman Incidents: Approximately three times per week, whenever Mandel was wearing a skirt, Harold Brenneman, Quality Manager, would comment on how "tan and smooth" her legs were.[2] Brenneman's employment overlapped with Mandel's from October 28, 1996 until December 1, 1997, when he left M & Q. Buckmaster testified that Brenneman made sexual innuendo comments about the women who worked as his assistants.

Conway Incidents: When Mandel told Conway she needed time off for gynecological surgery in June or July of 2006, he told her it was a "shame she would stoop to that level to take time off." On ten to fifteen occasions when Mandel wore high heel shoes during the summers of 2005 and 2006, Conway referred to them as "beat me, bite me" shoes.[3] Conway called Mandel by the following names: "darling" (up to ten times per month), "toots" (ten to fifteen times per month), "female" (thirty to fifty times per year), "woman" (fifteen times per month), and "missy" (ten to fifteen times per month). Mandel also heard from co-worker

---

[2]    In her EEOC Charge, Mandel alleged that in or around 1998, after she had her nails professionally done, Brenneman told her that he fantasized about what it would feel like for her to rub her nails down his back. She also alleged that Brenneman told her that he would think of her while he was having sex with his wife "so he could finish."

[3]    Conway admits that he referred to the shoes this way on one occasion by telling Mandel that a female friend of his calls high heels her "beat me, bite me" shoes.

Loreen Cunkle that Conway referred to Mandel as "fluffy" when she was not there.[4]  When Mandel was first employed at M & Q in 1996, she was required to make coffee for Dahm and Conway.  Mandel did not deliver the coffee to Dahm and Conway; she made it and left it in a pot in the kitchen.  Dahm and Conway were the only two employees Mandel noticed drinking the coffee.  Conway worked at M & Q the entire time Mandel was there.

Dahm Incidents: Between 2002 and 2003, Mandel was told three to five times by Larry Dahm, the Department Manager, that she was "foolish not to use [her] assets" and that she was "sitting on a gold mine, really, sitting on a gold mine."  Dahm also called her "hon," "darling," or "toots" up to five times per week until he left M & Q in 2006.[5]  Mandel also heard from Cunkle that Dahm, too, referred to Mandel as "fluffy" when she was not there.  Also, as detailed above, Mandel was required to make coffee for Dahm.

Rubenstein Incidents: On three occasions, Curt Rubenstein, Vice President of Sales, solicited Mandel for dates.  Rubenstein asked Mandel if she would go to the gym and work out with him, go out to dinner with him, and go back with him to where she was staying.  Rubenstein began working for M & Q in fall 2006.

Schmal Incidents: In an October 31, 2006 performance review, Schmal wrote, "Shannon always handles difficult situations, but I worry sometimes if she might break down."  When Mandel asked Schmal to explain that statement, he told her that she was "too female" and "too emotional."  Mandel also was reprimanded by Schmal for not attending the 2006

---

[4]     Conway admits that he called Mandel "fluffy" as an ironic reference to her moodiness in the workplace and stated that he would have stopped using the term if she had complained about it.

[5]     In her EEOC Charge, Mandel alleges that on one occasion when she was single, Dahm asked her if she was a "'lettuce sniffer,' meaning if I was lesbian."

holiday luncheon. She did not attend because her back was hurt and she needed to get work done in her office. She did not tell anyone in advance that she was not going to attend. After the lunch, Schmal called Mandel into his office and told her that her failure to attend was disrespectful and she needed to be a team player. He told her to shut her mouth when she tried to explain why she did not attend, but did not place a reprimand in her file regarding the luncheon absence. Mandel is unaware of whether any male employees missed the 2006 luncheon. In past years, Mandel claims, some male employees, who did not work under Schmal, have missed the luncheon and were not called into the office. In December of 2006, Schmal told Mandel to make sure the bathroom was "presentable" before a corporate executive luncheon. Mandel took this to mean she should clean the bathroom, and she did clean it, including the toilets. She claims that no men were asked to clean the bathroom.

Mandel did not complain about any of these issues or incidents with two exceptions. First, she complained to Schmidt on one occasion in 1996 about having to make coffee. She testified that Schmidt laughed in response and told her, "That's the way [Conway and Dahm] are." Second, Mandel mentioned to Buckmaster that Bachert had made inappropriate comments to Mandel. Buckmaster testified that she suggested that Mandel speak to Conway, but did not recall if Mandel took the advice. In her EEOC Charge, Mandel stated, "If I would have said anything about the comments it would have been impossible to work there or I believe I would have been immediately terminated."

### 4. Termination of Employment at M & Q

Mandel alleges and M & Q denies that during a meeting on April 6, 2007, Bachert referred to Mandel as a "bitch" and told her to "shut the fuck up." According to Mandel, this incident led her to believe that she had been constructively discharged. On May 23, 2007,

Mandel wrote a letter to Schmal giving him two weeks' notice that she was terminating her employment with M & Q. She did not mention any harassment or discrimination issues in the letter. Mandel later testified that this was because she feared retaliation. As of the date of her resignation letter, Mandel had a job offer from D. G. Yuengling & Son Inc.

## DISCUSSION

### A. Legal Standard for Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Anderson*, 477 U.S. at 248. An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id.* Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* 2D Charles Alan Wright & Arthur R. Miller, *Federal Practice and*

Procedure § 2727 (2d ed.1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the court that "the nonmoving party has failed to make a sufficient showing on an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). Once the moving party has satisfied its initial burden, the burden shifts to the non-moving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256–57. The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). And, "[t]o defeat summary judgment, [the non-moving party] 'cannot rest simply on the allegations in the pleadings,' but 'must rely on affidavits, depositions, answers to interrogatories, or admissions on file.'" *GFL Advantage Fund, Ltd. v. Colkitt*, 272 F.3d 189, 199 (3d Cir. 2001) (quoting *Bhatla v. U.S. Capital Corp.*, 990 F.2d 780, 787 (3d Cir. 1993)).

"To prevail on a motion for summary judgment, the non-moving party must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 270 (3d Cir. 2007) (citing Fed. R. Civ. P. 56(e)). "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, [it] must be more than a scintilla." *Id*. (quoting *Hugh v. Butler Cnty. Family*

10

*YMCA*, 418 F.3d 265, 267 (3d Cir. 2005)).  In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

## B. Title VII Claims

Mandel brings claims under Title VII of the Civil Rights Act of 1964, which makes it an "unlawful employment practice" for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C.  § 2000e-2(a)(1).  Title VII does not prohibit merely "economic" or "tangible" discrimination, but also protects workers from a "work environment abusive to employees because of their . . . gender."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 15, 21–22 (1993).  Count I of Mandel's Complaint alleges sex discrimination and Count II alleges sexual harassment.  M & Q moves for summary judgment on both counts, arguing that Mandel cannot establish either a hostile work environment or constructive discharge.

### 1. Statute of Limitations

Under Title VII, a claimant in a deferral state, such as Pennsylvania, must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice before pursuing remedies in federal court.  42 U.S.C. § 2000e–5(e)(1); *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 854 (3d Cir. 2000).  "This statute of limitations applies to discrete employment actions, including promotion decisions."  *Id.* (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).  While "discrete discriminatory acts are not actionable if time barred," hostile environment claims may survive under the continuing violation theory.  *Morgan*, 536 U.S. at 113.  Hostile work

11

environment claims are distinguished because "[t]heir very nature involves repeated conduct," meaning the unlawful employment practice "cannot be said to occur on any particular day." *Id.* (internal citations omitted). Instead, "a hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (citing § 2000e–5(e)(1)). Thus, under the continuing violation theory, a hostile work environment claim "will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122.

Prior to the Supreme Court's decision in *Morgan*, the Third Circuit used "a non-exhaustive list of three factors to aid in distinguishing between the occurrence of isolated acts of discrimination and a persistent, ongoing pattern." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 166 (3d Cir. 2013). Those factors used in "distinguish[ing] continuing violations from isolated occurrences" were "the subject matter, frequency, and degree of permanence of the underlying acts." *Id.* (citing *West v. Phila. Elec. Co.*, 45 F.3d 744, 755 n.9 (3d Cir. 1995); *Rush v. Scott Specialty Gases, Inc.*, 113 F.3d 476, 481–82 (3d Cir. 1997)). However, the Third Circuit has recently clarified that, following *Morgan*, permanency is not required to establish a continuing violation. *Id.* As the Court has previously considered the subject matter and frequency[6] of the underlying acts in this case and determined that Mandel has satisfied these two factors, *Mandel v. M & Q*

---

[6] The Third Circuit has defined subject matter "as whether the violations constitute the same type of discrimination." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 166 n.2 (3d. Cir. 2013). It has defined permanence as "whether the nature of the violations should trigger the employee's awareness of the need to assert her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." *Id.*

12

*Packaging Corp.*, No. 3:09-CV-42, 2011 WL 3031264, at *7 (M.D. Pa. July 25, 2011), she may proceed under a continuing violation theory. *See Mandel*, 706 F.3d at 167. The Court's task on remand is to determine the scope of the incidents properly considered part of the continuing violation for Mandel's hostile work environment claim. *See id.*

M & Q contends that the only alleged incidents that are properly considered part of the continuing violation are those that allegedly occurred after February 2006 and involved Bachert, Conway, or Rubenstein. These incidents are: Bachert asking Mandel in 2006 if she hurt herself having sex; Bachert telling Mandel during a 2006 meeting that she was "being a bitch"; Bachert calling Mandel a "bitch" and telling her to "shut the fuck up" in a 2007 meeting; Conway regularly calling Mandel "toots," "woman," "female," and "missy" in 2006 and 2007; Conway referring to Mandel's high heels as "beat me, bite me" shoes in 2006; Conway telling Mandel that it was a shame that she would "stoop to" taking time off for gynecological surgery in 2006; and Rubenstein soliciting Mandel for dates on three occasions in 2006 and 2007. M & Q has advanced several arguments to narrow the scope of the continuing violation, which the Court will address in turn.

### a. Same Actors

M & Q first argues that the continuing violation doctrine mandates that the pre- and post- limitations period incidents be perpetrated by the same individuals. It emphasizes that the Third Circuit, in remanding the case for this Court to determine the scope of the incidents properly considered part of the continuing violation, noted that "Mandel has alleged at least one act that falls within the statute of limitations . . . and many of the acts that occurred prior to the applicable limitations period involved similar conduct by the same individuals, suggesting a persistent, ongoing pattern." *Mandel*, 706 F.3d at 167.

13

According to M & Q, the "Same Actors Analysis" requires the Court to examine whether the individuals alleged to have acted within the limitations period are the same as those alleged to have acted outside of the limitations period, and then exclude the acts of the individuals only alleged to have acted outside of the limitations period from the continuing violation. Doing so here would eliminate any conduct allegedly engaged in by Brenneman, Schmal, Dahm, and Benetz from the scope of the continuing violation.

However, none of the cases from within this circuit cited by M & Q directly stand for the proposition that a continuing violation can only consist of the actions of individuals alleged to have harassed the plaintiff both before and after the limitations period. In *Sloan*, a black female police officer for the City of Pittsburgh alleged, *inter alia*, that she was subjected to a racially hostile work environment. *Sloan v. City of Pittsburgh*, 110 F. App'x 207, 208 (3d Cir. 2004). Although she attempted to graft prior incidents to her hostile work environment claim as part of a continuing violation, the Third Circuit excluded those incidents because they involved City police officers, different than those alleged to have harassed her, allegedly harassing her sons. *Id.* at 210 n.3. Another case proffered by M & Q, *Boyer v. Johnson Matthey, Inc.*, No. 02–8382, 2005 WL 35893 (E.D. Pa. Jan. 6, 2005) is also inapposite. In *Boyer*, the district court found that prior racially charged statements made by a co-worker to or about co-workers other than the plaintiff did not raise an inference of discrimination as to the plaintiff's more recent claims of harassment because: none of the recent allegedly harassing conduct involved the previously offending co-worker, the prior statements were made more than a year and a half before the recent alleged conduct, and the prior statements were made about individuals other than the plaintiff. *Id.* The distinctions between this case on the one hand, and *Sloan* and

14

*Boyer* on the other, are manifest.  Neither case supports M & Q's "Same Actors" theory.

As M & Q has not provided applicable authority that supports its proposition that a continuing violation can only consist of the actions of individuals alleged to have harassed the plaintiff both before and after the limitations period, the Court will not exclude the alleged incidents of harassment by Brenneman, Schmal, Dahm, and Benetz from the scope of the continuing violation.

### b.  Hiatus

Next, M & Q contends that any alleged harassment that occurred prior to a hiatus in harassment must be excluded from the continuing violation.  M & Q claims that because no allegedly harassing conduct was alleged to have occurred between 1998 and February 2006, all alleged incidents of harassment alleged to have occurred prior to February 2006 should not be considered part of the continuing violation.

M & Q correctly notes that courts have found that a gap or hiatus between allegedly discriminatory comments or acts does not establish a continuing violation.  *See, e.g., Hamera v. County of Berks*, 248 F. App'x 422, 424 (3d Cir. 2007) (finding no continuing violation because earlier conduct was not actionable due to a four-year break between allegedly discriminatory comments); *Coombs v. Target Corp.*, No. 12–4651, 2013 WL 664186, at *4 (E.D. Pa. Feb. 25, 2013) (finding that a two-year break between alleged discriminatory acts "destroys the pattern of harassment and does not establish a continuing violation").  However, a hiatus does not exist here.  Mandel has presented evidence that male co-workers repeatedly and regularly called her names such as "darling," "toots," "missy," and "woman" throughout her entire tenure at M & Q.  Therefore, the Court will not exclude all alleged incidents of harassment alleged to have occurred

15

prior to February 2006 from the scope of the continuing violation.

### c. EEOC Charge Incidents

Finally, M & Q claims that the three specific instances of harassment that Mandel identified in her EEOC Charge but did not testify about at her deposition[7] are not part of the continuing violation. M & Q emphasizes that Mandel testified twice at deposition that other than the alleged incidents to which she had already testified, there were no further incidents of alleged harassment or discrimination that she was subjected to while working at M & Q. It also points to a Third Circuit decision stating that when a prior affidavit conflicts with later deposition testimony, the affidavit can be discounted. *See In Re: CitX Corp., Inc.*, 448 F.3d 672, 678–80 (3d Cir. 2006).

However, the Court finds M & Q's reliance on *CitX* to be misplaced, as that case is factually inapposite. In *CitX*, an affiant gave a willfully false "sham affidavit," which related to matters of which he had no personal knowledge, in an attempt to create a facts sufficient to survive a summary judgment motion. *Id.* at 678–79. The district court discounted the sham affidavit in light of the affiant's subsequent deposition testimony, which strongly suggested that the affidavit was falsified, and its decision was upheld by the Third Circuit. *Id.* at 679–80. Here, there is no evidence that Mandel provided false information in her EEOC Charge or at her deposition. Accordingly, the three alleged instances of harassment mentioned in Mandel's EEOC Charge will not be excluded from the scope of the continuing violation. *See* 10B Charles Alan Wright, Arthur R. Miller &

---

[7] These alleged incidents are: Brenneman telling Mandel that he fantasized about what it would feel like for her to rub her nails down his back; Brenneman telling Mandel that he would think of her while he was having sex with his wife "so he could finish"; and Dahm asking Mandel, who was single at the time, if she was a "lettuce sniffer," which she alleges to mean "a lesbian."

16

Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 334–35 (3d ed. 1998) ("[A] witness' affidavit will not be automatically excluded because it conflicts with [her] earlier *or* later deposition, despite the greater reliability usually attributed to the deposition.")

### d. Conclusion

The scope of the continuing violation for Mandel's hostile work environment claim will include all incidents of harassment alleged in Mandel's Complaint and EEOC Charge, except for the allegation regarding a failure to promote in 2006, a discrete employment actions which this Court has previously determined to be time-barred.

### 2. Sexual Harassment

Sexual harassment is prohibited under Title VII where a plaintiff demonstrates that it was "sufficiently severe or pervasive to alter the conditions of the [plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 447 U.S. 57, 67 (1986) (internal quotation marks omitted). In the Third Circuit, a plaintiff must establish five elements to succeed on a hostile work environment claim: (1) the employee suffered intentional discrimination because of their sex; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected the plaintiff; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability. *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990). The first four elements are required to establish a hostile work environment; the fifth element determines employer liability. *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). The Court will address these elements in order.

### a. Intentional Discrimination Based on Sex

To establish intentional discrimination because of sex, a plaintiff need not show "direct evidence" of the harasser's motivation or intent. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001). Rather, "intent to discriminate can be inferred" from the record. *Id.* (citations omitted). Here, Mandel has presented evidence that several male employees at M & Q, *inter alia*, asked questions about her sex life and sexual orientation, asked her out on dates, commented that her legs were "tan and smooth," told her that she was "sitting on a gold mine" and "foolish not to use [her] assets," told her that they fantasized abut her, told her that it was "a shame" that she would "stoop to" taking time off for gynecological surgery, and called her names such as "bitch," "female," "toots," "missy," and "woman." When viewed in the light most favorable to Mandel, this is sufficient evidence from which a reasonable jury could infer that the alleged harassment was based on her sex.

### b. Severe or Pervasive Discrimination

In considering whether a workplace is hostile, courts must consider the totality of circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). Generally, mere teasing, offhand comments, and isolated mild incidents are not sufficiently severe or pervasive to establish a hostile work environment claim; Title VII is not a "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (U.S. 1998) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75. 80-82 (1998).

Mandel has adduced evidence that male employees at M & Q asked her questions about her sex life and sexual orientation, asked her out on dates, commented that her legs were "tan and smooth," told her that she was "sitting on a gold mine" and "foolish not to use [her] assets," told her that they fantasized about her, told her that it was "a shame" that she would "stoop to" taking time off for gynecological surgery, and called her names such as "bitch," "female," "toots," "missy," and "woman."  She has also provided evidence that alleged incidents of harassment started soon after she was hired in 1996, continued until she left M & Q in 1997, and occurred multiple times per week.  When viewed in the light most favorable to Mandel, the evidence is sufficient for a reasonable jury to find, after considering the totality of the circumstances,  that the allegedly harassing conduct was severe or pervasive.

### c. Effect of Harassment on Plaintiff

Psychological harm and unreasonable interference with work performance are both relevant, but not necessary, factors in the inquiry into the harassment's effect on the plaintiff.  *Harris*, 510 U.S. at 22-23.  In light of the Third Circuit's determination that a jury could reasonably conclude that Mandel did not invite the allegedly harassing comments or conduct and was offended by them, *Mandel*, 706 F.3d at 169, the Court will decline to grant summary judgment in M & Q's favor based on this third element.

### d. Effect of Harassment on Objectively Reasonable Person

To succeed on the fourth element, a plaintiff must show that the harassment would be offensive to an objectively reasonable person in order to "ensure that courts and juries do not mistake ordinary socializing in the workplace–such as male-on-male horseplay or intersexual flirtation–for discriminatory 'conditions of employment.'" *Oncale*, 523 U.S. at

81. Here, an objectively reasonable person in Mandel's place might be offended by being called a bitch, asked whether she had injured herself having sex, being criticized for taking time off for gynecological surgery, being told and being referred to by arguably condescending or degrading terms such as "toots" or "missy," *inter alia*. Thus, Mandel has presented evidence, when viewed in the light most favorable to her, sufficient for a reasonable jury to determine that the alleged harassment was objectively offensive.

### e. *Respondeat Superior* Liability

"The basis for an employer's liability for hostile environment sexual harassment depends on whether the harasser is the victim's supervisor or merely a coworker." *Huston*, 568 F.3d at 104. When a harasser is a co-worker or other non-supervisor, employer liability attaches "only if the employer failed to provide a reasonable avenue for complaint, or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Id.* "Where the alleged perpetrator of the harassment is a supervisory employee, the analysis set forth by the Supreme Court in *Faragher* and *Ellerth* supplies the appropriate framework for assessing an employer's liability." *Hargrave v. Cnty. of Atlantic*, 262 F. Supp. 2d 393, 428 (D.N.J. 2003). *Faragher* and *Ellerth* "hold that an employer is strictly liable for supervisor harassment that culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Pennsylvania State Police. v. Suders*, 542 U.S. 129, 137 (2004) (internal quotations omitted). However, when there is no tangible employment action, both decisions hold that an employer may raise an affirmative defense to strict liability for supervisor harassment: "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and

correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Ellerth*, 524 U.S. at 765; accord *Faragher*, 524 U.S. at 807. In the context of constructive discharge, the Supreme Court has held that "an employer does not have recourse to the *Ellerth/Faragher* affirmative defense when a supervisor's official act precipitates the constructive discharge; absent such a 'tangible employment action,' however, the defense is available to the employer whose supervisors are charged with harassment." *Suders*, 542 U.S. at 140–141.

Courts distinguish "employees 'who are supervisors merely as a function of nomenclature from those who are entrusted with actual supervisory powers.'" *Griffin v. Harrisburg Prop. Servs.,* 421 F. App'x 204, 208 (3d Cir. 2011) (quoting Parkins v. Civil Constructors, 163 F.3d 1027, 1033 (7th Cir. 1998)). "Although the Supreme Court has not specifically defined the term supervisor for purposes of determining an employer's liability for a hostile work environment, the Court has described the power to supervise as 'to hire and fire, and to set work schedules and pay rates.'" *Jackson v. T & N Van Serv.*, 86 F. Supp. 2d 497, 501 (E.D. Pa. 2000) (quoting *Faragher*, 524 U.S. at 803). Even though the Third Circuit has not explicitly defined a supervisor, it has relied upon its decision in *Huston*, in which it "considered who qualifies as a 'management-level employee' for purposes of imputing constructive notice to an employer in a co-worker harassment case,"[8] in determining whether an individual is a supervisor for purposes of

---

[8]  In *Huston*, the Third Circuit found that an employee's knowledge could be imputed "where the employee is sufficiently senior in the employer's governing hierarchy, or otherwise in a position of administrative responsibility over employees under him, such as a departmental or plant manager, so that knowledge is important to the employee's general managerial duties." 568 F.3d at 107. "[M]ere supervisory

determining employer liability in a hostile work environment claim.  *Griffin*, 421 F. App'x at 208–09 (citing *Huston*, 568 F.3d at 107–08).

Regardless of whether the alleged harassers are classified as her co-workers or supervisors with immediate (or successively higher) authority over her, Mandel has presented enough evidence that a reasonable jury, when viewing the evidence in the light most favorable to her, could find that she has satisfied the final element of her *prima facie* hostile work environment claim.  She has provided evidence that there was no training on sexual harassment, equal opportunity employment, or discrimination during her employment at M & Q.  She has also testified that she was sexually harassed by upper-level management officials at M & Q, including the Managing Director, Human Resources Manager, and Plant Manager.  This evidence, if proven to be true, would be sufficient for *respondeat superior* liability to attach if the alleged harassers are classified as Mandel's co-workers, as M & Q "knew or should have known of the harassment and failed to take prompt and appropriate remedial action."  *Huston*, 568 F.3d at 104.

Mandel also testified that she knew of other female M & Q employees who complained of harassment and discrimination and were subsequently forced out of the company.  In addition, she testified that she did not feel comfortable bringing complaints to her supervisor's attention.  Mandel further stated in her sworn EEOC Charge that she believed that if she complained about the allegedly harassing or discriminatory conduct, she would have immediately been terminated or the workplace conditions would have

authority over the performance of work assignments by other co-workers is not, by itself, sufficient to qualify an employee for management level status." *Id.* at 108. Rather, the employee must "have a mandate generally to regulate the workplace environment . . . ." *Id.*

made it impossible to continue working at M & Q.  This evidence, if proven to be true, would be sufficient for *respondeat superior* liability to attach if the alleged harassers are classified as supervisors with immediate (or successively higher) authority over Mandel, as such evidence shows that she did not "unreasonably fail[ ] to take advantage of any preventive or corrective opportunities" provided by M & Q.[9]  *Ellerth*, 524 U.S. at 765. Accordingly, the Court will not grant summary judgment in M & Q's favor on this element.

### f. Conclusion

When viewing the facts in the light most favorable to Mandel, a reasonable jury could find that she has provided evidence sufficient to establish the existence of a hostile work environment.  Accordingly, M & Q's motion for summary judgment on Mandel's sexual harassment claim will be denied.

### 3. Laches

M & Q argues that even if the Court does not dismiss Mandel's hostile work environment claim, her claim still fails because M & Q has asserted and substantiated a laches defense.  An employer defendant in a Title VII case "may raise a laches defense, which bars a plaintiff from maintaining a suit if he unreasonably delays in filing a suit and as a result harms the defendant."  *Nat'l R.R. Passenger Corp v. Morgan*, 536 U.S. 101, 121 (2002); *see also Brzozowski v. Corr. Physician Svs., Inc.*, 360 F.3d 173, 181 (3d Cir. 2004) (citing *Morgan*, 536 U.S. at 121).  The elements of the equitable defense of laches are "(1) lack of diligence by the party against whom the defense is asserted, and (2)

---

[9]      The *Ellerth*/*Faragher* affirmative defense is available to M & Q in such a situation because Mandel does not allege that her resignation (or constructive discharge) was precipitated by a supervisor's official act or "tangible employment action" (*e.g.*, a humiliating demotion, extreme pay cut, or transfer to a position in which she would face unbearable working conditions).

23

prejudice to the party asserting the defense." *E.E.O.C. v. Great Atl. & Pac. Tea Co.,* 735 F.2d 69, 80 (3d Cir. 1984). The burden of establishing it is on the defendant. *See id.* "As an equitable doctrine, the decision to apply laches is left to the sound discretion of the District Court." *Holmes v. Pension Plan of Bethlehem Steel Corp.,* 213 F.3d 124, 134 (3d Cir. 2000) (citing *Gruca v. U.S. Steel Corp.,* 495 F.2d 1252, 1258 (3d Cir. 1974)).

As to lack of diligence, the party's delay in bringing suit must be unreasonable. *See Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.,* 401 F.3d 123, 138 (3d Cir. 2005). M & Q contends that Mandel did not diligently bring or pursue her claim, as she alleges that she was repeatedly harassed as early as October 1996, but did not file her EEOC Charge alleging sexual harassment until December 2007, months after leaving the company. It also maintains that, with the exception of complaining to Schmidt about having to make coffee, Mandel did not complain about any alleged incidents of sexual harassment. Whether Mandel's delay was unreasonable need not be resolved, however, because M & Q has not met its burden of demonstrating prejudice from the delay.

"The essential element of laches is prejudice; the party asserting the defense must show that it has suffered some significant injury from the delay in the claim being brought." *In re Sheckard,* 394 B.R. 56, 66 (E.D. Pa. 2008). "To establish prejudice, the party raising laches must demonstrate that the delay caused a disadvantage in asserting and establishing a claimed right or defense; the mere loss of what one would have otherwise kept does not establish prejudice." *In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 337 (3d Cir. 2004) (internal quotation marks omitted). Stated differently, the party must "show that some change in the condition or relations of the parties occurred during the period in which the plaintiff unreasonably failed to act." *Appel v. Kaufman,* 728 F.

24

Supp. 2d 684, 698 (E.D. Pa. 2010) (internal quotation marks omitted).

M & Q offers several reasons why it has been prejudiced by Mandel's lack of diligence. It first claims that it is prejudiced in defending against the allegations concerning the individuals who allegedly sexually harassed Mandel but no longer work for M & Q—Brenneman, Dahm, Conway, and Rubenstein—because they may not be able to be found or available to testify. M & Q also argues that it is prejudiced by Mandel's delay because its current or former employees may not be able to remember incidents which are alleged to have occurred between six and sixteen years ago, especially when Mandel cannot recall the dates of certain alleged incidents. M & Q further contends that it is prejudiced because Mandel's failure to complain about sexual harassment internally or file a charge denied it the ability to act upon her complaint and prevent any alleged harassment from occurring in the future. Finally, M & Q maintains that it has been prejudiced because Mandel's delay in filing her EEOC Charge has unfairly increased her potential award for punitive or emotional damages.

The Court finds, however, that M & Q has not met its burden of demonstrating prejudice from Mandel's delay. Although the concrete reasons offered by M & Q amount, at most, to minor inconvenience, they do not amount to prejudice. Accordingly, the Court, in its discretion, finds that M & Q's defense of laches is not viable here and will not prevent Mandel's hostile work environment claim from proceeding to trial.

### 4. Constructive Discharge

Mandel also asserts a constructive discharge claim based on sex discrimination. To prevail in a sex discrimination claim under Title VII, a plaintiff must first establish a *prima facie* case of discrimination. *Tex. Dept. of Comm'y Affairs v. Burdine*, 450 U.S.

248, 252–53 (1981).  A *prima facie* case of discrimination requires Mandel to show that: (1) she is a member of a protected class; (2) she was qualified for the position she sought to attain or retain; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that could give rise to an inference of intentional discrimination.  *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1066 n.5 (3d Cir. 1996) (en banc)).  The Third Circuit has noted that "there is a low bar for establishing a *prima facie* case of employment discrimination."  *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006).  Here, M & Q does not dispute that Mandel satisfies the first two elements of a prima facie case of discrimination.  Instead, it contends that she has not satisfied the third and fourth elements.

Mandel contends that the 2007 meeting during which Bachert called her a "bitch" and told her to "shut the fuck up" caused her to resign, resulting in a constructive discharge.  A claim of constructive discharge constitutes an adverse employment action. *See Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998).  To establish a constructive discharge, Mandel must show that M & Q "knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign."  *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887 (3d Cir. 1984).  The Third Circuit employs this objective test so that "an employee's subjective perceptions of unfairness or harshness do not govern a claim of constructive discharge."  *Mandel*, 706 F.3d at 169 (citing *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992)). It considers a number of factors in determining whether an employee was forced to

resign, including whether she "was threatened with discharge, encouraged to resign, demoted, subject to reduced pay or benefits, involuntarily transferred to a less desirable position, subject to altered job responsibilities, or given unsatisfactory job evaluations." *Id.* at 169–170 (citing *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 503 (3d Cir. 2010)).

"To prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Spencer v. Wal-Mart Stores, Inc.*, 469 F.3d 311, 317 n.4 (3d Cir. 2006). Because a reasonable jury, when viewing the evidence in the light most favorable to Mandel, could find that Mandel established a hostile work environment, a genuine issue of material fact exists as to whether she can show discrimination so intolerable that it would make a reasonable employee resign. Therefore, a genuine issue of material fact also remains as to whether the adverse employment action gives rise to an inference of unlawful discrimination. Accordingly, M & Q's motion for summary judgment on Mandel's constructive discharge claim will be denied.

## **CONCLUSION**

For the reasons explained above, the Court will deny M & Q's motion for summary judgment (Doc. 27) on Mandel's hostile work environment and constructive discharge claims. Accordingly, M & Q's Motion for Approval to Tax Videotaped Depositions (Doc. 42) and Mandel's Objections to and Motion for Review of Bill of Costs (Doc. 46) are denied without prejudice as moot. An appropriate order follows.

May 7, 2013       /s/ A. Richard Caputo
Date          A. Richard Caputo
            United States District Judge